Colart Americas v. National Labor Relations Board Numbers 22, 3462, 23-1290, and 23-1299, and I believe we'll be starting with you, Mr. Brin. May it please the Court. Good morning. I am Robert Boone, Counsel for the Petitioner Appellant, Colart Americas, Inc., and I wish to reserve five minutes for rebuttal. Granted. So we believe that the National Labor Relations Board failed to meet its burden to establish by substantial evidence that Colart violated the Act. Today we wish to focus on three themes. One, did the Board prove by substantial evidence that Hargrove suffered an adverse employment action by being reassigned to SMG? We say that it did not. Two, did the Board prove by substantial evidence that Hargrove engaged in protected activity under the Act or threatened employees if they did so? We say that the Board did not. And three, the third theme is that if Hargrove did engage in protected activity, would Colart have still reassigned him as it did? And we believe that Colart met its burden in this regard. To put all this in perspective, I just want to point out a few general facts. One, that Hargrove was a temporary employee. He only worked his total tender was three and a half months. Hargrove was not fired or hired by Colart. SMG did that. Hargrove did not pay Colart. SMG did that. There's no dispute that these are joint employers, right? At least joint employers through the date of the reassignment, yes. So why shouldn't we think of this not as a transfer or simple reassignment, but that one of these two joint employers is actually terminating the employment? So he's reverting to the other employer. Well, I think that's a flaw in the way that the Board pursued this. They're treating the reassignment as a discharge, as a termination. But this was a reassignment, and there's no precedent saying that a mere reassignment is a discharge or an adverse employment action. We contend that the reassignment, it was then up to SMG to determine what to do with him, but it was important. And this was a flaw in the ALJ prohibiting Colart from putting in evidence on what happened after the reassignment. Well, you're calling it a reassignment, but I guess I'm asking since there's no dispute that these are joint employers and he is no longer employed by Colart, why isn't that a termination by one of the joint employers? Because there still has to be an adverse employment action, and if this is a reassignment among joint employers, then the question is whether the new assignment would have been a cut in pay, an increase in pay, a better job, a worse job, better hours, closer to home, all those things the Court has repeatedly held is important to determine. As to the testimony and evidence after December 2nd? Pardon me? You're arguing as to the testimony after December 2nd? Yeah, we needed to know what SMG did with Hargrove and what happened. We just don't know because we weren't entitled to put that evidence in. Oh, no, go ahead. I just wanted to ask you a basic question about your adverse action argument here. The cases you cite seem to be 8A3 cases, discrimination, which requires an adverse action. 8A1 requires interference, and 8A4 requires discharge or otherwise discriminate. So is adverse action, you know, your opponents just say an employment action, not an adverse action. So is adverse action applicable in the 8A1 and 8A4 space? I believe they are. I believe that is the right-line test, that there has to be an adverse employment action for any of those charges. In the same way it's defined in Title VII and 8A3? In Title VII? Title VII discrimination cases, adverse employment action, than 8A3, which seems to employ that. Yeah, well, there could be some distinction between Title VII and Section VII of the NLRA, but I think the gist of it is, yes, there has to be an adverse employment action, and this is transferred, there's cases on transfer, cases on reassignment, where the board has held, or the courts have held, that it's not an adverse employment action. At Starbucks, you know, there was adverse employment action, but everything happened in the context of anti-union animus as to what was going on. But there, applying right-line, there was still, the court said, well, there's no discharge here. There was no cut in hours. Well, in that one, in Starbucks, it was because the employee was denied a transfer, not because they were transferred. It doesn't stand for the proposition that a transfer is not an adverse employment action. Well, if the employee had a right to a transfer and was denied that transfer, then that would have been an adverse employment action. But the court said if there's no right to it, if the employee had no holding on it, then the court, then the employer was free to deny that transfer. If the employee denied that transfer, if it were a right, then that would have been an adverse employment action. And at Wal-Mart. Why isn't the significance of cases like Starbucks or Lancaster-Fairfield County Hospital, or the Fourth Circuit's decision in LRB versus air contact transport, that there is a different standard for the kind of adverse action that's required under A-1 than there is for A-3. A-3 uses the language of terms and conditions. Terms and conditions of employment sounds like the kinds of adverse actions that, as Judge Chung was indicating, are treated as adverse employment actions for Title VII purposes. But the language of A-1 would seem to be much broader and cover things that were merely coercive or intimidating. A threat, for example, where there was no actual action taken. I think the issue there is that what did Hargrove bring with him to COLARC as an employee? And he didn't bring with him any right to the job at COLARC. He brought with him employment through COLARC and really through SMG. So you can't get to the adverse action issue until you know what SMG was going to do. He may have gotten a job at $2 an hour more. He may have gotten a job that was closer to home. We don't know that. So we don't know in this transfer case whether it was an adverse action. But the case that you said, where I was actually going, actually says that even if a transfer involves higher pay, it doesn't necessarily mean it doesn't meet the requirements because it could be less desirable in other ways. And here, the reassignment, there's no pay. There's no further employment at all. We don't know what would have happened, what happened on the other side of December 2nd, because the judge prohibited COLARC from doing anything other than whether or not he could come back to COLARC. The judge says, I'm not taking any more evidence as to what happened December 2nd in Ford. In Ford, there was an issue as to what happened after the reassignment. Well, it was an unusual facts scenario in Ford. But the court definitely said, or the board said, that a transfer, a failure to transfer is not in and of itself an adverse employment action. You have to look at those other factors, factors that we were denied the ability to put into evidence. So we think that our hands were tied. Okay. And I didn't see an offer of what that evidence would have been within your briefing and how that would have affected that decision. I think it's implied in the record. You know, there was an off-the-record discussion where the judge came out and the general counsel said, well, we're not going to claim COLARC as a joint employer after December 2nd. Well, okay, then what did COLARC do? All COLARC did was reassign the person, which they always had a right to do. In fact, COLARC had no right to discipline the employee. Only SMG could discipline or fire the employee. COLARC's only remedy when it was dissatisfied with the employee was to reassign. But, I mean, your argument seems to be that if the evidence were permitted, it would have altered the decision-making. What is that evidence? I did not see detail. What is that evidence? We weren't allowed to put it in, so we don't know. So we think that, at the very least, we should be allowed to put in that evidence to continue to tie up that loose end, if you will. But we were unable to do that under these circumstances. Do you agree that under 8A1, that even with a threat to take action, that that could be sufficient to qualify as something that interferes with, restrains, or coerces an employee in the exercise of rights? Well, that would be separate. You don't have to have an adverse – if you threaten people, that would be wrong. And we contend that the Board did not meet its evidence, evidentiary standard, by establishing that a threat occurred. The only supposed threat was this one statement allegedly made by Trejo, that if you just talk among yourselves and don't bring your issues to us, there's going to be a problem. Right. Well, we can talk about that in a second. But, I mean, you see the issue, because if it's – if a threat is enough to qualify under 8A1, then it's not strictly a terms and conditions of employment type of adverse action. And a reassignment is something more concrete than even a threat. If that's something an employee does not want and is getting reassigned for exercising their rights under the National Labor Relations Act, then why wouldn't that qualify under 8A1? Well, I don't think it would apply to Hargrove for one reason or another, because after that statement was made, he was gone. It wasn't that he did anything. It was because of what happened before that statement was made, the performance issues. So for Hargrove, you know, he was – the threat was – the alleged threat was meaningless. But as to the other employees, we contend that that was not a threat. We contend that that was merely a statement saying that we want to deal with your issues, just like Trejo did when he first heard of Hargrove's issues. We want to be able to look into it and address that. And there's no authority. One of the reasons the ALJ considered it – the reason for his transfer or reassignment pretextual was the time card indicating that he did, in fact, work on Black Friday. Is that disputed at this point, or do you concede that was just an error in the testimony? There was a concern at one point that he did not work on Black Friday, but they eventually determined that he did. That was not a reason for his termination. So there was discussion. Did he work on Black Friday? And then they found out he did. So there was evidence that that loose end was never tied either, but it was also never said that that was a reason for the action that they took. What do we do with the board's footnote five where it indicates, even if Hargrove was not actually engaged in constricted activity, that Colart apparently thought that he was and that Trejo's comments to the group indicated that he viewed the reports he got as reflecting a concerted action? I don't believe the evidence supports that statement and that footnote. I think that if anybody takes this to the Labor Board, it would be a problem. That's what Hargrove said twice. And is that enough to put the employer on notice that they're engaging in concerted activity? I don't think so, not in the context of what they were talking about at that time. I was even bothered that the transcript used Labor Board in capital letters when Labor Board can mean a number of things. As the dissenting member of the board indicated, when you look at the context, this was more about race and about the ADA than it was about any concerted activity and an element. Right, but I think Judge Krause's point is that since Trejo addressed a group and discussed racism, the evidence reflects that Trejo considered it to be a group complaint rather than an individual complaint. And I think Judge Krause was asking, as in footnote five, how are we to interpret the fact that Trejo addressed the concerns of racism to a group? Because Trejo talked to each of the employees and found out that some were concerned about race. They're individual claims, but no one came to Trejo. No one said to Trejo that we have this issue as a group. It's very different than what happened in Briscoe, which this court decided. Doesn't that just corroborate Hargrove's complaint and confirm that it was reflecting a group concern? Then why didn't Colart reassign everybody if the group was pushing something like that? There was never an issue, according to Trejo, according to the company, according to me, there was never an issue that they were going to bring a group complaint. There was no group complaint. It was, look, you guys are concerned about racism. This is why these kinds of decisions are made. But if you don't talk to me about these concerns, if you just let it stew and never get it to management, because management never knew that they were talking amongst themselves. There was no evidence of that, that they were talking amongst themselves. There was no evidence that the group had coalesced, that there was a coalescement, if that's a word, of group activity. And that's critical in Briscoe, that there has to be evidence that they coalesced as a group. And that just doesn't exist here. So I'll come back from my rebuttal. Thank you very much, Erin. Mr. Hiller. Good morning, Your Honors. May it please the Court, Joel Hiller for the National Labor Relations Board. Substantial record evidence supports the Board's finding that Colart threatened and retaliated against employees for engaging in activity that the National Labor Relations Act protects. Now, Colart's arguments on appeal are largely efforts to relitigate the case and to present its own version of the facts. But none of them are sufficient to warrant disturbing the Board's findings under this Court's standard of review. So I suppose I'll start with the threat violation from Trejo. So he told employees that they shouldn't be talking about workplace issues among themselves, that they should only bring their complaints to management. But employees have a right to discuss terms and conditions of employment among themselves. That is core to the rights guaranteed in Section 7 of the NLRA. He also told them it would be a problem if they talked among themselves and not to him. And that's a threat, threatening employees not to do what they have a statutory right to do. You know, the only evidence that he said that it would be a problem was Hargrove's own testimony. That's correct. Credited testimony, yes. Well, it's credited, although the ALJ also indicates its understanding that he told those present that they could, with a qualifier, that employees could talk among themselves. The ALJ said that, but the Board reversed that determination as unsupported. Trejo himself didn't even testify that he said that. So the Board's finding is there's the credited testimony as to what Hargrove said, and that it did not, I wouldn't even say it's a credibility determination, because it was not whether, it's not they're looking at testimony from Trejo saying he made this qualification and they discredited it. They simply said there's no evidence, even from Trejo himself, that he made that qualification. And really on appeal, I think this all just comes down to the credibility. Sorry, Collard says that Trejo didn't say what the Board found that he said. Well, Trejo does say, he does deny, right, that he told them that they can't talk among themselves. Why isn't that a reasonable inference from the ALJ, and what justifies the Board in, you know, if that was the finding based on testimony before the ALJ, why should we not defer to that rather than the Board's reversal of that finding as to the testimony? Well, I think they're two separate things, actually. What the Board reversed the ALJ on is the idea that Trejo made a qualifying statement that, you know, you actually can talk amongst yourselves. And that's where there's no testimony, even from him, that he said that. The ALJ did not credit Trejo's denial that he made the, it was going to be a problem statement, because the ALJ included that statement from Hargrove's testimony in the ALJ's decision. And the Board agreed with that. So the Board and the ALJ are aligned on that point, that Trejo did make that it was going to be a problem statement. So on that one, they credited Hargrove and discredited Trejo. And the discord standard for credibility determinations is whether it's patently unreasonable or inherently incredible. And I don't think it rises to that level. In fact, Kohler doesn't even explain why it would rise to that level. They just say, here's what we say Trejo said, but they don't give reasons why you should overturn the Board's credibility determination. But we have to look at the statement in context, right? In context, why shouldn't we view this as Trejo trying to tell the group of employees, I'm here. My door is open. Management can't fix these problems unless you bring it to us. So bring it up the chain. And, you know, if you don't, we can't do anything about it. Well, two points in response to that. First is that the 8A1 standard is an objective standard. And so you're not actually looking at what Trejo's intent was by making this statement. And the second point is, I think that's a gloss on what he said, because that's not actually what he said. He said that, or the credited testimony of what he said was, don't talk amongst yourselves. Bring it to me or to someone else. Follow the chain of command. And it's going to be a problem if you don't. And so you're looking at what a reasonable employee would understand that to mean. And the board's finding, based on its expertise in this area, is that the reasonable employee would take that as a threat. And so that is the basis for the 8A1 threat violation. Can you talk to us about the adverse employment action standard and whether it is different for A1 versus A3? Sure. And so to violate the act, it has to be an unlawfully motivated action taken against the employee because they exercised in unprotected activity under the NLRA. And so we have that here. He was let go from his position. He was not simply transferred to somewhere else. His employment at Colart ended. It was done as of December 2nd. Would it still be an adverse? I mean, I guess to Judge Cross's point, does it have to be adverse? And would it still meet the standard if, as soon as he were sent back to SMG, SMJ immediately employed him elsewhere? Right. I think, yes. That issue would be most starkly presented in that scenario, that literally he leaves Colart and then he's whisked to a different employer and starts immediately there. That's not the case here. And so I don't think that – But what is your position on – Yes. Does it have to be adverse or not? And, you know, as you said, that would be a stark example. Right. Can you opine on that? I think that, I guess, first of all, the court doesn't actually have to address that here because we know that that's not what happened. I think in the scenario that you present, I think that's a terrible call. I don't want to step too far outside my bounds here as the agency attorney in a case that doesn't present that issue. I think if it is – right. It is an unlawfully motivated end of his assignment, that strikes me as sufficient to violate at A1. And I think that – Is that because it's a different legal standard as to what action would violate A1 than A3? Right. Now, I see the arguments that you're making. I find them compelling. But, again, I can't really step outside my bounds here because that issue wasn't addressed by the board in this decision, the 8A1 versus the 8A3, because this was not argued to the board. And so it's not actually in the board's decision in this case. I think that it is important to know that – and certainly the analogy to Title VII wasn't argued before the board and wasn't I think it's important to know that there's this complaint – well, two things. But the first one is there's this complaint that we just don't know what happened after December 2nd. But that's not true. There actually is evidence in the record already about what happened after December 2nd. There's testimony that Hargov spoke with Herrera, who is the person at staff management, on December 6th about a potential other job. Didn't end up working out. But we at least know that there was a gap between December 2nd and December 6th when he did not have a new assignment from SMG. So that's already in the record. So there's already a couple of days in which he is missing out on pay and benefits and anything else that comes with it. That's the part we don't know because that testimony didn't come in with the ALJ. Sorry, this testimony did come in. It's a different part than the evidentiary ruling they're complaining about. But as to whether staff management was giving any pay or benefits or anything covering that period and what the terms and conditions would be of the employment that he was offered to take up, none of that came in because you successfully argued that it was irrelevant. And that does seem to tee up the question about whether you need to have something like a change in terms and conditions of employment or it can be any action by an employer that has the effect of interfering with or coercing an employee in the exercise of their rights. Right. So I think that it certainly does interfere with your rights when you're told you have to leave this position because of your protected activity. And so, right, we also agree that when whatever timing there is between when he was let go from his assignment at Colart and whatever happened next, if he got a new assignment, that goes to how much back pay he is owed. It doesn't go to Colart's liability. So if they have the opportunity to fight this further in a follow-on board compliance proceeding, if they want to be able to prove that he got a new assignment from SMG on X date and so therefore he is only owed one day of back pay, one week of back pay, whatever, that's still on the table if the parties can't agree on that amount. But as far as liability, which is what is at stake in this proceeding, the judge's ruling was that wasn't relevant and you're reviewing that finding for abuse of discretion. Another point as to something you made, Judge Krause, we do know that, now I acknowledge it's not specifically talking about this period, but there is testimony that's describing that staff management will pay an employee only if the client, in this case Colart, reports hours that that person worked. Because there was a time at which the underlying issue is an issue in this appeal where Hargrove didn't get paid by SMG and had to follow through. And the reason he didn't get paid is because Colart hadn't sent his timesheets over. That's not alleged to be a violation. But it does show you that staff management only pays you if Colart says you worked there. And so I think you can take from that that if he's no longer working at Colart, staff management isn't just, from grace, paying him during the time where they're waiting to assign him to another place. And if you want to look at that, it's at 136 to 139 of the transcript and also there's an email at 563 of the administrative record. Mr. Howell, there are a couple cases that are pending before the Supreme Court that I'm sure your client is watching with great interest. And I wonder what you see as the implications for this case, either in terms of the SEC's ability to hold hearings like the board here and what deference we give the Chevron and the like to agencies. What implications do you see that having, if any, for this case? Well, I don't think any, certainly, because these issues were not raised at any point. They're not raised before the board. They're not raised before this court. So I don't think it's – they're just not at issue here. I think if you want me to apply them further, just since we're all here, I mean, I think this is – this isn't a Chevron case because this is not a statutory interpretation case. And I think there's talk of deference to agencies, but this is on things like factual findings and general kind of expertise in labor relations, but that's not a Chevron deference issue. As far as the ALJs, I guess I don't really have anything to say on that other than that it's not presented at any stage of this litigation. I do want to correct one thing, and that is about Black Friday. He – there is testimony that his failure to – supposed failure to work on Black Friday was one of the reasons why he was being let go. I think it's at page 95 to 96 of the transcript. If I'm wrong on that, it's either there or somewhere in the 30s or earlier in the 90s. I was just looking through my citations in the brief, but they're in the brief. The citations are in the brief. I believe he was told – Hargrove was told by Holmes that one of the reasons he was let go was that he didn't work on Black Friday, which, of course, is now uncontested, that he did work on Black Friday. So that is a false reason for the discharge. And so that itself is strong evidence of pretext. There's the other evidence of pretext that we go through in the brief, but the fact that there are multiple reasons given, one that shows is this kind of shifting rationale problem where you tell the employee or testify as to multiple reasons that's kind of indications, circumstantial indications that the reasons are no good, they're pretextual. One of those reasons, the Black Friday one, is actually we know is false. And the discussion about whether he was listening to supervisors, I think we kind of go through that in the brief in detail, explaining why that is not corroborated by the evidence in the record. It was really kind of once he started complaining that some people at Kohler started thinking about this as a problem. But even then, it's not – they don't kind of corroborate one another. One person says it was at this point. One person says it was at different points. They mention this part about Cardono, but she didn't testify and she was actually talking about something else other than not listening to instructions. Can you address A4? Yes. I appreciate that you've made – you've argued that it's forfeit, but say it's not and we're looking at right line there. What do we do with the statement by Holmes that if you want to go to the Labor Board, you can just go and the interpretation of it by the dissenting board member that there's unresolved and unexplained credibility findings by the ALJ and given what was said as to agency and Labor Board without specifics, that it's not reasonable to infer that that's the National Labor Relations Board. Right. So the first point is that yes, so Holmes responded by saying, sure, you can go to the Labor Board. I can't stop you. And if that was the end of the story, maybe we'd have a tougher case. But then a couple hours later, they made the decision to let Kohler go. So I think that's the important thing we're talking about. So whatever he said to Hargrove at the time, the fact that they shortly thereafter decided they needed to let this guy go, that's the problem. And then I don't think it's really a credibility issue. Hargrove, admittedly, he mentioned a couple things in that conversation. He says, I'm going to the Labor Board. Holmes says, why are you going to the Labor Board? And Hargrove responded. He said some things that were personal to him, but then he said some things that were these kind of truly group complaints that we've been talking about, that other employees had been discussing as well, that both amongst each other and to Trejo, and that was the racism in the workplace, the removal of the chairs, the promotion of this new supervisor over several long-term employees. And so I don't think it's really a, it's not so much a credibility as what he was talking about when he said he was going to the Labor Board. He was talking about both of those things. And just because he included some individual concerns in the context of his group concerns doesn't mean the group concerns are any less concerted. And I think the fact that, right. In that same footnote, it said that the dissenting ALJ or the dissenting board member distinguished the cases that said even threats to go to the board on issues that are non-cognizable are still recognized as protected activity. Yes. Is there any decision-making that distinguishes that proposition that even threats about non-cognizable activity are protected? So I think, right. When they are non-cognizable, I mean, there's cases cited in the board decision and in our briefs supporting that point, that even if it's a non-cognizable board action. Right. But are there any distinguishing authorities that you've? Cases going the other way? Not that I'm aware of. I mean, I can't promise that there aren't. But I'm not aware of any. And the reason for that is that when an employee says, I'm going to the labor board and it is for a non-NLRA purpose, they're just wrong about who they're supposed to go to. What should happen in that scenario is the board will dismiss the charge. It's not for the employer to take things into its own hands and say, well, I know you've actually got the wrong agency in mind here, so I'm going to retaliate against you for coming to me and not knowing your labor and employment law. Because employees tend to be non-legal experts often, and so that is why we have this standard. And the Supreme Court, in the Scrivner case, talks about how employees should have what they called complete freedom to come to the board, prospective complainants, actual complainants. Because the board can't really do anything by itself. It depends upon individuals coming to it and bringing claims. So that's why they want the channels of communication to be clear. And if the employee is wrong about whether this is an NLRA claim, the NLRB will take care of that. Judge Krauss referenced your position that the discharge complaint was not preserved or it was forfeited. What is your position? It's kind of tricky. The evidentiary issue sort of rests upon COLART's contention that actions have to be adverse, as defined in sort of the 8A3 canon of law. But they don't argue that in Section 3 of their brief, where they're talking about whether or not something was a motivated action. So, you know, Mr. Boonin started his argument with that point, that this was not an adverse action. But is that forfeited since it wasn't raised in – since they only challenged whether it was a motivating factor rather than that the standard is adverse, as in 8A3? I think – so your question is whether the adverse action issue is properly before the court? Right. So I think going back to – and I do see my time is up. Is it okay if I answer? Yes. Yes. Looking at the section of the transcript where this evidentiary ruling was made about post-December 2nd evidence, they're not talking about adverse actions there. They're talking about a joint employer issue, which is no longer contested. They're talking about whether COLART would have discharged or let go of all their attempts at the end of December. Of course, that's not relevant here because Hargrove was let go at the beginning of December. They're not talking about adverse action at that section. So I think as far as linking it up to the issue presented now, that's not how it was presented to the board. They mentioned the word adverse action in their briefing to the board. They don't really make the arguments they're making now. So – and it was raised in the opening brief. I think it is an issue that is being presented in a new way now. I guess I can't say 100% that it is clearly forfeited, though I think you can make the argument that it was not adequately presented, even if it was kind of – like I said, the words adverse action appear, but they're not making the same argument that they're making now for sure. Thank you. Thank you. Thank you. The issue about what happened after December 2nd is because this was not a discharge. The board wishes that this be viewed as a discharge, and therefore December 2nd was a critical date. But it was a reassignment. It was a continuum of this employment, whether it be with SMG or with Colart. And we were unable to continue on that continuum based on the judge's ruling. He said Colart cannot bring any more evidence about what happened after December 2nd. That's not going to be relevant. And we believe it is. This is not just about what the damages are. This is about whether or not there was an adverse action. We don't even know if he was taken off the payroll. Right. But even if we were to find it were an abuse of discretion, it would then be a harmless error analysis, wouldn't it? And you haven't really presented anything for us to conclude it's not harmless. I think it was fatal to Colart because they were unable to put that information in evidence. But you haven't – there is some evidence of what happened post-December 2nd, and Colart has not presented any evidence that would rebut that or allow us to conclude it's harmless, has it? Whether only statements made by Hargrove that Colart was unable to develop in any way as to what happened, whether Hargrove was right, whether that was true, whether or not that was because Hargrove said, I've got something else to do. We don't know what happened because Colart was unable to put in evidence about that. SMG perhaps did. SMG may have had that right, may have missed that opportunity when it got that evidence out, but Colart was unable to pursue it. And I'm just trying to understand, when you say unable to pursue it, do you just mean purely through a line of cross-examination? And bringing on witnesses that would then testify as to what SMG did after December 2nd. But you are not saying who those witnesses are or what they would say. Well, I think I know generally who they would be, but Colart was not able to pursue that line of questioning with either the witnesses that were there or bring in other witnesses to determine those facts. But again, it's a continuum. If it were a discharge, then that would be a significant determination, a discharge by Colart. But we don't know if it was a discharge because a mere reassignment, as this Court said and as the Board said, that a mere reassignment is not an adverse employment action. We need to know more. But why isn't there enough in the record, as Mr. Heller suggested, to conclude that at a minimum there's a gap in pay? We don't know that. We don't know exactly what SMG does. No, I would assume there is a gap in pay. But yes, if you're going to be assigned to Colart, you're going to get paid for your work at Colart. But once you're reassigned, that's a different issue. Again, that's part of the continuum that we have no record of as to what happened. And I think we should have been entitled to bring in that evidence and pursue that evidence to determine whether or not that was an adverse employment action. And to wrap up on some of these other issues, the alleged threat, he says, if you have, instead of talking among yourself, instead come to me. That's the chain of command argument. The cases that the board cites to on this issue, the DHC case and the kinder care learning case, I just drove by kinder care on the way here, are very distinguishable. Those cases involve statements that, as opposed to there's going to be a problem, what's the problem? It's just that we're not going to be able to solve your problem, address your issues, as opposed to there's going to be big trouble if you do something. I mean, that was the kinder care case, big trouble. And if you fill out those forms, I'm going to slap it on your forehead. It was very, you are going to be disciplined if you do this. There was no threat like that in this case. This pales compared to the cases where those kinds of statements, chain of command is a threat. Is the statement there's a problem immediately followed by Hargrove's firing together a threat? You know, if there's a, there will be a problem, meaning you will be fired just like Hargrove? Well, there would be a problem if it was not trio statements. It would be a problem if it was Hargrove's statements. That this is not patently, patently, what do we say, patently unreasonable or inherently incredible. I mean, if it's, if in fact that was a statement, standing alone, is that a threat? There will be a problem. Is that a threat? Well, there would, you know, Hargrove can't make a threat. Now, Hargrove says, you know, because there's a race issue, if anybody goes to the labor board, that would be a problem. Well, what's that mean? It would be a problem. Well, who is the labor board? If anybody, it's not that we are going to the labor board. I am speaking on behalf of others. I, he said, I feel there was racism. He doesn't say we feel. I think Judge Chung is speaking to Trejo's statements at the. I'm sorry, I can't hear you, Judge. I think Judge Chung is speaking to Trejo's statements at the December 2nd meeting, if I understand the question correctly. I'm sorry, I wasn't clear. The Trejo statement? If that statement is credited, that he said that it will be a problem if they were to speak among each other, is that a threat of reprisal? Well, no, because, you know, the decision to fire Hargrove was made before that meeting. And also, they couldn't, you know, threaten him and then fire him before he had a chance to do anything. You know, there would be a problem, going to be a problem, will be a problem. These are different conversations set by different people in different contexts. And I think they're trying to morph these together. But I think when you look at them in context, going to be a problem is not that there would be a problem, that you will be fired, that there will be discipline, which is the facts in kinder care and in DHC, that there's a threat, there's a union activity. We know there's union activity, and the employer crossed the line in those cases. In this case, we don't know there's any coalescement, that word again, of a group action. We don't know, there's no indication that there's a union or that they're acting as a group. You know, these were individual complaints that were brought up. And he said, look, you know, you've got these problems. Yeah, you can talk among yourselves, I guess, but if you want them to be dealt with, follow the chain of command. And the case law is clear that that in and of itself is not a violation of the law. Mr. Boone, we've gone a bit over time. Could I ask you just for a minute or so, can you address why we shouldn't find the A4 arguments forfeited? Well, I think it's in our briefing, Issue 1, that we're talking about the threats and the coercion issues. But, you know, I think we also discussed the issue of the threat. I think it's the same evidence as well that we are relying on. But A4 is, it's a UOP to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under the Act. He had not given any testimony. He had not filed charges. Neither have he. And, again, he wasn't even discharged, in our view. So we think it is part of the gestalt of the argument, if you will, that we have preserved it. I think the Supreme Court has interpreted that language a little more broadly than you're suggesting in terms of what the employee may need to do. But I take your argument to be that you sufficiently addressed it in the first section of your brief. Perhaps not eloquently, but yes. Okay. All right. We thank both counsel for arguments today. And we will take the case under advisory.